Curran, Dennis J., J.
Introduction
Davood Shahin, a licensed architect doing business as DSH Design Group, has sued developer Taunton Land Development, LLC for inter alia, breach of contract, quantum meruit, and a chapter 93A violation. Taunton counterclaimed for negligence, breach of contract, intentional and negligent misrepresentation, and chapter 93A violations. All of Taunton’s counterclaims were dismissed after Shahin’s motion for summary judgment.
Shahin’s claims went to trial before a jury on November 19 and 20, 2009, and resulted in an award of $68,496 for breach of contract. In response to a request for advisory findings under chapter 93A, the jury found that Taunton had engaged in unfair and deceptive practices and found that $35,000 was adequate compensation for such violations, but because Taunton’s conduct was willful or knowing, such sum should be doubled to $70,000.
The matter is presently before me on Shahin’s chapter 93A claim and his petition for attorneys fees and costs under that statute, both opposed by Taunton.
THE FACTS
Developer Taunton, through its promoter and principal Michael DiGuiseppe, was casting about for an architect to work on a substantial project to design a shopping center at Taunton Crossing. It requested bids from several architectural firms, to which Shahin, a sole proprietor, responded:
. . . [T]hank you for considering us to team up with you in the Design of Taunton Crossing. Because of our interest in establishing a long relationship with you and your company!,] we have based our fee on actual cost and have tried to be reasonable in our estimate by careful examination of the scope of work. I believe the fee presented in this agreement is by far below the market rate and I hope you will find it satisfactory.
We are veiy excited about the prospect of teaming up with you and your company on your current and hopefully!,] future projects.
(See letter of Davood Shahin dated October 27, 2004, trial exhibit.) (Emphasis added.) On February 1, 2005, DSH and Taunton entered into the first of four contracts by which Shahin would provide architectural services for the shopping center construction project. On May 27, 2005, the parties entered into three more such agreements, these for architectural design services to construct retail stores for Michaels, TJMaxx, and Her One Imports. The original agreement stated that:

This agreement is based upon a mutual obligation of good faith and fair dealing between the parties . . . Accordingly, the Owner and Architect with positive commitment to honesty and integrity will assist in the other’s performance and will work diligently to fulfill its obligation and will cooperate in the common endeavor of the agreement.

On February 28, 2006, Shahin submitted its final billing invoices totaling $68,496, and in doing so, reduced his bill as a courtesy by $1,855. Under the terms of their contract, payment was due within thirty days. Taunton responded by hurling charges of project deficiencies, and asserted that Shahin owed it more than $200,000 in “back charges” caused by design defects which increased construction costs. These claims were accompanied by Taunton’s in terrorem threat to sue Shahin for professional negligence and assert claims under his liability insurance policy. After six months of purported negotiation, Taunton agreed to pay Shahin nearly $54,000, with Shahin’s liability carrier agreeing to pay him an additional $8,000 to avoid protracted litigation defense costs. However, when Taunton learned that an additional money source existed, it immediately repudiated the settlement agreement and instead, asserted claims against Shahin’s insurance policy.
Suit commenced. Taunton asserted five counterclaims at Shahin, each of which required discovery and defense, but all of which were ultimately dismissed on summary judgment. DiGuiseppe admitted at trial that he had simply “made up” the facts in his summary judgment affidavit to disclaim liability. Shahin prevailed at the summary judgment stage on Taunton’s counterclaims, and ultimately, after trial on his contract claim. It took over three and a half years for a jury to confirm what Shahin knew, ab initio: that he was lawfully entitled to his entire fee for architectural work, and that Taunton had deceived him by falsely leading him on to believe he would be paid.
We now turn to the question of whether Shahin’s petition for fees and costs is reasonable, applying those facts detailed in Linthicum v. Achambault, 379 Mass. 381, 388-89 (1979): the time and labor, skill required, nature of the case, issues presented, amount of damages involved, skill of the attorney, experience, reputation and ability of the attorney, the similar prices for similar services, and the results achieved.
a. Time and Labor
The starting point in this inquiry is to examine the amount of time reasonably expended on the case. Here, plaintiff counsel’s records were detailed, properly descriptive and complete. He claims that although the case did not involve “big money,” the “original complexity and breadth of the factual issues involved in this case cannot be understated.” Taunton counters *224 that “at heart, this was a simple fee dispute.” The truth lies somewhere between these polar extremities.
Undercutting the plaintiffs present assertion is that discovery was essentially limited to word-processed interrogatories[1] and a request for production of documents. The plaintiff took no depositions.
Four witnesses testified at trial, which began and ended in two days. For this effort, Shahin states that over 161 law firm partnership billing hours were required, as well as over 250 hours of associates’ time, run up by six different associates. There is no evidence that Mr. Shahin paid any of the $121,619 in legal fees and $2,319.15 in costs; rather, it appears that the liability insurer paid for his defense against the counterclaims, and continued even after the Court allowed a discovery sanctions motion that precluded Taunton from introducing any expert testimony at trial, the insurer also paid for Shahin to advance his non-payment claim.[2] Thus, counsels’ bills to Shahin would have greater credence if they were actually paid by him,[3] rather than passed off to an arguably less interested, institutional third party.[4] Given this fact, the billings appear designed for the presentation of an anticipated chapter 93A fee recovery rather than reflecting an economical use of attorneys’ time in a relatively straightforward collection matter — albeit needlessly prolonged by the developer’s intransigence and litigation savvy.
b.The Amount of Damages
It is not simply the amount of money expended to chase a relatively modest recovery that is troubling; rather, it was the indulgent expenditure in obvious anticipation of fee-shifting. It is insufficient for the plaintiff to claim that his legal bills were high because this case underwent unsuccessful mediation, for many cases proceed down such a path, to no avail. Moreover, it is not enough for the plaintiff to claim that an extensive defense was warranted by the defendant’s counterclaims, for such commonly occurs in construction cases. Finally, it is unpersuasive to repeatedly proclaim that the “skill and efforts of counsel (see his Petition at page 5 — twice so mentioned, page 7— ’’skillful work," and page 7 — "[l]ess thoroughly prepared lawyers probably would have lost this case’’)[5] all to rationalize a Cadillac-style defense. These claims are doubtless true, but it is equally probable that a similarly professional, but less expensive, treatment of this case would have achieved the same result. Such an observation may seem harsh (although obviously not intended so), but it is the truth.
c.The Result Obtained
The plaintiffs ultimate success was unabashed; he prevailed in beating back Taunton’s many counterclaims; he also obtained a jury verdict which was well-earned and almost precisely what he was hoping for.[6]
d.The Experience, Reputation and Ability of the Attorney
Plaintiffs lead trial counsel’s resume bespeaks much experience “. . . in defending . . . brokerage firms and individuals with the securities industry, financial institutions in lender liability . . . [and defending] companies charged with environmental liability.” Construction disputes are but one of his many areas of concentration, but this lawsuit did not rise to the level of a complex environmental claim, or involve lender liability or securities regulation. Nevertheless, lead counsel’s experience, reputation and ability are outstanding; and his trial preparation impeccable and demeanor impressive.
e.Usual Charge for Similar Services
There can be no doubt that lead counsel here is well-deserving of an hourly rate of at least $350 in matters involving risk management, securities industry issues, lender liability, or in defending against environmental liability claims. (See Shahin’s Petition for Award of Fees and Costs; Tab “A,” biography of lead counsel.) Such a billing rate is perfectly reasonable for such cases;[7] however, this case was nowhere near as complex, and instead, calls for those rates set by supply and demand principles in insurance defense work as well as their objective worth. Accordingly, a partnership hourly billing rate of $180,[8] an associate’s rate of $130, and paralegal rates of $35 are appropriate here.[9] Such are the usual and customary rates charged for similar services by other Boston-area insurance defense attorneys — for example, those entrusted with defending physicians against medical malpractice claims.
f.The Nature of the Case and Issued Presented
Although Shahin viewed his case as a non-payment case, Taunton threw up a myriad of roadblocks, claiming that Shahin had failed to comply with the Building Code, denied liability for Change Orders, asserted it was entitled to “overages” it had paid Shahin, and claimed modification costs due to conflict with plans prepared by Shahin. (See Taunton’s answer to interrogatory no. 7.) For his part, Shahin responded that Taunton:
. . . [now] ha[s] a successful project at a reasonable price delivered on time with minimal changes . . . This turned into a fast track project without our prior agreement and, despite extra burdens on DSH, we continued without seeking extra compensation.
Shahin further asserted that he had done the following additional work, all without seeking compensation:
Value engineering; research of pre-fab tilt-up panels;
Multiple revisions of the Pier One loading dock;
Coordination with new soil engineers;
*225 Additional structural and mechanical engineering of late-added canopies; and
Office Depot’s “constant” changes.
All of these building specification issues required some familiarity with construction trades and practices to ensure proper representation.
g. Other Factors
It has taken three years for Shahin to defeat Taunton’s counterclaims and four years for a jury to successfully resolve his payment claim. Taunton principal DiGuiseppe’s gamesmanship caused such waste. Witness, for example, the developer’s tease in agreeing to mediation, but failure in tendering a reasonable offer during that process, or his on-again, off-again settlement agreement. Moreover, it is now some nine months after trial, and this Court remains in the dark as to just what defense Taunton was proffering to justify non-payment. Indeed, during trial, the Court inquired what defense Taunton intended to present, only to be told, in essence, that all would become clear when it called subcontractor Mark L. Plante, owner of Building Engineering Resources to the witness stand. Plante, defense counsel promised, would testify to the many deficiencies of Shahin’s work. However, when Plante testified, it quickly became apparent that no such testimony would be forthcoming. To the contrary, Plante testified that Shahin’s invoices were “appropriate,” “legitimate” and that “he was entitled to be paid.” Upon cross-examination, when Plante was asked whether defense counsel was aware of what his trial testimony would be, he revealed that defense counsel had interviewed him by telephone on the eve of trial and he had told him precisely what he would be testifying to. After hearing this preview, Taunton’s counsel responded: “We’re screwed. We’re fu — ed.”
Although it has boggled the mind what the defense was in this case, upon reflection, the answer is clear: there was none. Taunton’s promoter, Michael DiGuiseppe of Beverly Farms, hired a sole proprietor/subcontractor anxious for work who, he misperceived, might be willing to accept a fraction of his contract price for the value for his services. Such was the modus operandi of a developer who sought to systematically fleece his subcontractors.[10] When Shahin had the audacity to seek full payment, the inference is reasonable— and inescapable — that the developer became so irked he began a studied practice of obfuscation, half-truths and non-truths. For example, he admitted under oath that he had simply “made up” certain statements he had falsely attributed to Shahin. The long four years’ search for a defense revealed its empty soul when Taunton’s own counsel admitted as much in a moment of candor with witness Plante.
SUMMARY
This is a case that should never have come to trial.
Shahin was entitled to be paid thirty days after he submitted his invoices more than four years ago. That he has been made to wait reveals the unseemliness and sad state of developer/subcontractor business relationships. Here, a well-heeled developer used greater financial leverage to cheat a small business owner out of his hard-earned monies. Such conduct is unconscionable, and well satisfies both willful and knowing unfair and deceptive acts and practices contemplated by chapter 93A.
ORDER
For the foregoing reasons, an amended judgment shall enter doubling the jury advisory award of $35,000 on the chapter 93A finding, to which shall be added attorneys fees in the sum of $60,684 plus $2,379.15 in costs, for a total chapter 93A fees and costs award of $63,063.15. Interest shall be calculated by the Clerk in accordance with applicable law.

 For example, the first five interrogatories asked the usual pro forma questions such as the identify of the answer preparer, witnesses, expert witnesses and trial exhibits, followed by three questions relating to damages claims, and eleven questions asking the facts supporting the defendant’s counterclaims.

 Indeed, some thirteen (13) months before trial, the Court allowed a motion to preclude Taunton from offering any expert testimony at trial, thereby dissipating any professional negligence issue from being raised by Taunton in either its defense or by counterclaim.

 This begs the obvious question of whether Mr. Shahin would have personally spent over $121,000 in advancing a claim for half that sum and in defending against the developer’s counterclaims.

 The Court is well aware of an insurer’s reporting requirements and usual second-guessing of its defense attorneys at virtually every stage of litigation. Nevertheless, the point still stands — the decision to continue to pay defense costs reflected a commercial, rather than an individual, decision.

 Quoting with approval, Rini v. United Van Lines, Inc., 903 F.Sup.234, 238 (D.Mass. 1995).

 In the joint pretrial memorandum, the plaintiff sought a judgment of $71,404; he realized $68,496.

 Although the court is aware of Fronk v. Fowler, 22 Mass. L. Rptr. 53 (April 6, 2007) (Burnes, J.), authorizing a Wilmer-Hale partner billing rate of $450-$575, this Court declines to join in such an endorsement.

 This is approximately the hourly rate even Shahin’s counsel concedes is applicable to such legal work.

 This computes to a total of $28,998 for partnership time (161.6 hours times $ 180 per hour), $31,487.50 for associates’ time (251.9 hours times $125 per hour), and $198.50 for paralegal services (5.7 hours times $35 per hour). The total of these three figures is $60,684.

 Indeed, Plante testified that DiGuiseppe and Taunton had shortchanged him too, owing him $16,000 for basic contract services and $11,000 in additional work.